**ASTRO LIMOUSINE SERVICE, INC., Plaintiff,**

v.

**HILLSBOROUGH COUNTY AVIATION AUTHORITY, Defendant.**

No. 84–1219–CIV–T–17.

United States District Court, M.D. Florida, Tampa Division.

Feb. 12, 1988.

Fredric S. Zinober, Tew & Zinober, Clearwater, Fla., for plaintiff.

Lynn Hamilton Cole, Allen, Dell Frank & Trinkle, Tampa, Fla., for defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

KOVACHEVICH, District Judge.

This cause is before the Court on Defendant's cross-motion for summary judgment, and motion to modify consent order, both filed on December 8, 1987, and Plaintiff's motion for partial summary judg-

ment, filed on December 11, 1987. The Court also has for consideration Defendant's response in opposition to Plaintiff's motion for partial summary judgment, filed December 23, 1987; Plaintiff's request for oral argument, opposition to motion to modify consent order, and opposition to Defendant's cross-motion for summary judgment, filed on December 24, 1987.

The question before the Court is whether the rules, regulations, and ground transportation operations policy of the Hillsborough County Aviation Authority (hereinafter Authority) violate plaintiff's right to commercial free speech under the First and Fourteenth Amendments of the United States Constitution. Defendant seeks summary judgment as to Count I, and seeks dismissal as to Counts II and III of the amended complaint. Count I turns on the issue of commercial free speech, Count II on the issue of unfair competition, and Count III on the exclusive jurisdiction of the Authority to regulate limousines at Tampa International Airport (hereinafter Airport). Plaintiff seeks summary judgment as to Count I of the amended complaint.

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–97 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. [477 U.S. at 322, 106 S.Ct. at 2552–53, 91 L.Ed.2d] at 273.

The Court also said, "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2553, 91 L.Ed.2d at p. 274. The Court is satisfied that no genuine issue remains for trial as to whether the rules, regulations and policy of the ground transportation operations of the Airport violate Plaintiff's right to commercial free speech under the First and Fourteenth Amendments of the United States Constitution.

FACTS:

Plaintiff, Astro Limousine Service, Inc. (hereinafter Astro), is a permitted operator of a limousine service at Tampa International Airport. Astro pays a fee in order to obtain a permit to drop off customers at the curbside of the second level of the Airport. Astro is required to pick up its pre-reserved customers in the designated quadrants at the curbside. Pursuant to the rules and regulations of the Hillsborough County Aviation Authority, Astro is required to identify its vehicles by putting the name of the company, its logo, telephone number and address on each vehicle. Astro's employees are required to display its logo on their uniforms.

There is no restriction on the right of any contract or non-contract carrier to engage in off-Airport advertising. However, the rules, regulations, and ground transportation operating policies prohibit non-contract carriers from soliciting any passenger in the Airport. "Soliciting" means to ask any person if he desires limousine service. If a prospective passenger initiates contact, non-contract carriers may respond with information. Contract carriers may solicit from the dispatch booths. One booth is located in each quadrant. Passengers may obtain information on limousine service to a

particular area from the dispatcher. If the passenger is pre-reserved with a specific carrier, the dispatcher is required to notify the passenger of the location for that limousine operator. There is one sign which identifies the pick-up location for all non-contract carriers. The sign lists the name of all non-contract companies. Non-contract carriers are not permitted to have their own dispatch booths, nor may they participate in the booths manned by the contract carriers. Upon request, the limousine dispatcher is required to inform passengers or others of alternative means of ground transportation and where they can be obtained. Non-contract carriers are forbidden to leave their vehicle unattended for any period of time. The Authority strictly enforces its rules, regulations, and operating procedures.

Defendant Hillsborough County Aviation Authority is a public body created by act of the Florida Legislature. The Authority is charged with a duty to regulate, exercise exclusive control over, and to grant conditional concessions on such terms as it shall deem proper to the use of Tampa International Airport. The Authority is further empowered "to exercise all powers necessarily incidental to the exercise of the general and special powers herein granted." 1983 Fla. Laws, Ch. 83–424, § 2.12(e). Thus, the Authority is empowered "[to negotiate contracts] with any businesses as the Authority may deem necessary for the development and expansion of [its] airports and airport facilities." 1983 Fla. Laws, Ch. 83–424, § 2.03.

The Airport is designated a "large hub airport" by the Federal Aviation Authority. In the past twelve (12) months, the Airport has processed over ten million passengers. The adequacy of ground transportation, including limousine service, for passengers between the Airport and the surrounding geographic areas is the responsibility of the Authority. Ground transportation at the Airport is an indispensable ingredient of the overall operation of the Airport. Prior to 1984, all commercial and private vehicles stopped to pick up passengers in the drive-through lanes in front of the baggage claim area. At peak times, traffic congestion reached critical proportions.

GROUND TRANSPORTATION OPERATIONS POLICY:

Peat, Marwick, Mitchell & Co. (hereinafter Peat Marwick), airport consultants for the Authority, prepared an updated Airport Master plan in 1981 which provided for increased parking and additional curbside facilities. The plan also provided for additional passenger loading facilities for commercial ground transportation vehicles.

In May, 1982, Peat Marwick began assisting Authority staff in the development of a comprehensive master plan for ground transportation at the Airport. This master plan was to be implemented after the garage expansion was completed. In formulating the master plan, Peat Marwick took into account the following components:

a) Traffic and activity surveys of existing ground transportation operations;

b) Physical planning and design of ground transportation facilities adjacent to the Landside Building;

c) Formulation and revision of comprehensive ground transportation policies;

d) Review and revision of commercial ground transportation contract and permit arrangements then in use by the Airport, consistent with the ground transportation policies; and

e) Modification of Ground Transportation Operating Procedures to reflect new and expanded ground transportation facilities.

The result of Peat Marwick's analysis of the above elements was an independent recommendation that the majority of commercial ground transportation operations be accommodated in four ground transportation quadrants. In 1983, while the quadrants were being constructed, Peat Marwick undertook specific analysis of the ground transportation policies. This analysis consisted of:

a) Independent review of correspondence, survey data and alternatives on commercial ground transportation prepared by the Authority staff from 1980 to 1983;

b) A telephone survey of commercial vehicle arrangements and fees at other U.S. airports;

c) Review of office reference files on airport ground transportation; and

d) Preparation of a series of "discussion drafts" of policy options for in-depth review with Authority staff.

Peat Marwick made its recommendation after weighing the following objectives regarding ground transportation:

a) Provide a high level of service to the traveling public;

b) Provide convenient facilities for commercial ground transportation operators within the physical and operational constraints of Airport facilities;

c) Require all commercial ground transportation operators regularly serving the Airport to show evidence of adequate liability insurance and to enter into a contract, permit or other use agreement with the Authority;

d) Allocate parking and pick-up spaces generally in relation to the demand for such services;

e) Establish fees on a basis of recovering the costs of providing operating facilities for commercial ground transportation;

f) Regulate ground transportation services only to the extent necessary to ensure acceptable standards of service and to minimize traffic congestion.

One goal of the Authority was to discourage the use of the Airport by courtesy vehicles because of 1) the limited amount of curbside at the Landside Building; 2) the limited number of spaces on the courtesy vehicle curbsides in the Ground Transportation Quadrants, and 3) safety and environmental considerations. (Brink Affidavit, p. 10). Peat Marwick's recommendation is set out in detail in the letter of October 9, 1983, directed to George Bean, and attached to the affidavit of Marjorie Brink, Exhibit 1 in support of defendant's motion for summary judgment. That recommendation includes the present system of competitive bidding for contracts for the geographic service areas.

## COUNT I—CONTENT REGULATION OF COMMERCIAL SPEECH

The issue is whether the Plaintiff's right of commercial speech is unconstitutionally impaired by the plan adopted by the Authority because of the limitation on Plaintiff's ability to solicit at the Airport.

■ Commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. See *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 603, 604, 87 S.Ct. 1224, 1242–43, 1243, 18 L.Ed.2d 303 (1967). Such speech serves individual and societal interests in assuring informed and reliable decisionmaking. *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761–765, 96 S.Ct. 1817, 1825–27, 48 L.Ed.2d 346 (1976). Advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest. See *Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). The Constitution affords less protection to commercial speech than to other constitutionally safeguarded forms of expression. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 562–563, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980).

In *Central Hudson*, the Court adopted a four-part test for assessing the validity of restrictions on commercial speech. Under *Central Hudson*, commercial speech receives a limited form of First Amendment protection so long as it concerns a lawful activity and is not misleading or fraudulent. Once it is determined that the First Amendment applies to the particular kind of commercial speech at issue, then the speech may be restricted only if the government's interest in doing so is substantial, the restrictions directly advance the government's asserted interest, and the restrictions are no more extensive than nec-

essary to serve that interest. 447 U.S. at 566.

■ Astro Limousine is seeking to advertise its services at the Airport. Astro wishes to advertise the price, nature and availability of service. Astro wants the non-contract carriers to have their own dispatch booth, and the ability to verbally solicit. At present, Astro has no representative on location to attract business and its drivers may not leave their vehicles unattended. Astro has no parking space, and may stop at curbside only to pick up pre-reserved passengers. Astro gets its business from pre-reservations as well as from "walk-ups" who are able to flag an Astro vehicle. The commercial speech at issue meets the first two prongs of *Central Hudson* in that it concerns lawful activity and is not misleading or fraudulent.

The next question is whether the government interest is substantial. The Authority adopted its present Ground Transportation Operations Policy to address problems arising from increasing traffic congestion at the Airport. These include the safety and welfare of the public, quality of service, avoidance of duplication of services, profitability, and effort to make the Airport viable and self-supporting.

Revenue-raising is undoubtedly a legitimate and substantial government objective. See *Gannett Satellite Information Network v. Metropolitan Trans. Auth.*, 745 F.2d 767, 775 (2d Cir.1984); see also, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 2717–18, 41 L.Ed.2d 770 (1974). The Authority's interest in raising revenue and preventing wide fluctuation in its receipts is particularly strong because Florida law requires it to meet all those expenses not covered by government grants by collecting various user fees. 1977 Fla.Laws, ch. 651, at Sec. 6. *Alamo Rent–A–Car v. Sarasota–Manatee Airport Authority*, 825 F.2d 367 (11th Cir.1987). Under the bidding system, the Authority is able to recover the costs of providing operating facilities for commercial ground transportation. (Mast Affidavit, p. 2).

The Authority was created by the Florida legislature to develop and administer public airports in Tampa. The Authority is a government arm of the State; it has the power of eminent domain and the authority to limit and prohibit competition which is destructive of the promotion of commerce and tourism. *Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority*, 801 F.2d 1286, 1288 (11th Cir.1986). Plaintiff admits that the development of commerce and tourism is a substantial government interest (Opposition to Cross–Motion for Summary Judgment, p. 8). The Ground Transportation Operations Policy was designed to reduce traffic congestion and to ensure a safe and orderly flow of traffic, as well as to provide improved service to the public. These factors directly advance the development of commerce and tourism in this area.

The function of advertising is to create demand for the advertised service. Here, the privilege of solicitation is being used as a funnel to direct customers to the contract companies. The contract companies have two significant advantages arising from their presence in the airport: access to walk-up customers and overall customer convenience. The privilege is bargained for and paid for in the bidding process for the contracts awarded. It serves to give the contract companies first crack at the pool of available customers because their representative is present in a fixed place to receive customers and take their orders for service. The permitted carriers may not park unless awaiting a pre-reserved passenger; they may circle the area. If a customer requests service, the permitted carriers may accept the customer. The process of getting customers is more constant for the contract carrier who has a representative in a fixed place, as opposed to the non-contract carrier who must rely on a chance meeting for walk-up business.

This feature was consciously built into the contract awarded. It serves to assure a more certain level of business for the contract company. In return, the Authority is assured that an acceptable level of service will be maintained. The plan adopted further provides a revenue stream

for the Authority so it meets its goal of financial viability. The "funnel" also serves to control the density of traffic in the quadrants. Contract carriers have fixed parking places assigned to their vehicles. The design of the ground transportation quadrants is such that there is no space available to increase the available parking spaces. The parking spaces have been carefully allocated according to the needs of the various geographic areas for service. (McGucken Affidavit, Exh. 10, p. 2) The present demand for services beyond those provided by contract carriers is such that the vans which circle the quadrants cause no safety hazard.

Plaintiff has asked that this Court disregard Defendant's emphasis on the space limitation. The Court declines to do so since the primary reason for the adoption of the Ground Transportation Operations Policy was the problem of traffic congestion. If commercial vehicles are not parked, they are in circulation in traffic. Also, there is a relationship between the available amount of parking spaces and the presence of the number of vehicles necessary to provide constant transportation. (McGucken Aff., Exh. 10, p. 2). The present plan allows commercial vehicles to circle safely while maximizing commercial vehicle volume within the physical space constraints of each quad lot. To change the quad lot system to accommodate additional parking spaces would require an additional eight spaces per quad lot. The physical constraints of the quad lots prohibit such an expansion, and would require the revamping and restructuring of the entire quad lot system and the circulation roadways around the Airport terminal. (McGucken Affidavit, Exh. 10, p. 3) If the non-contract carriers were granted solicitation privileges, this would increase the demand for their services. Since the amount of available parking spaces cannot be increased, the density of traffic would necessarily increase, exacerbating the problem that the Ground Transportation Operations Policy was designed to alleviate.

The Authority considered and discarded the possibility of restricting the Airport to one carrier. In *Commuter Transporta-*

*tion Systems v. Hillsborough Aviation Authority*, 801 F.2d 1286, 1290 (11th Cir. 1986), the Court said: "The Authority was given power to grant concessions, upon such terms and conditions as it shall deem proper. This expressed provision would certainly encompass the granting or exclusion of limousine operators to and from the airport." The Court in *Commuter* found that state policy clearly intended that The Authority may displace unrestrained business competition at the airport with regulation of monopoly public service. This Court agrees with Defendant that the power to completely ban all other limousine operators includes the lesser power to limit advertising and solicitation and to grant a contractual privilege to another carrier. The Court is relying on *Posadas de Puerto Rico Associates, d/b/a Condado Holiday Inn v. Tourism Company of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), in which the Court said:

> It is precisely because the government could have enacted a wholesale prohibition of the underlying conduct that it is permissible for the government to take less obtrusive steps in allowing the conduct, but reducing the demand through restrictions on advertising. [478 U.S. at ——, 106 S.Ct. at 2979], 92 L.Ed.2d at 284.

The plan proposed by Peat Marwick was designed to bring order out of chaos. The plan as adopted has worked well to achieve *all* of its goals, including safety, convenience to the traveling public, and revenue-raising. Astro is requesting that the Court focus only on making information as to its services available to the traveling public, so that the public can make an informed decision about which carrier to choose. The Court does not believe that, under the facts of this case, the individual and societal interest in assuring informed and reliable decision-making takes precedence over the substantial governmental interests in safety, promotion of commerce and tourism, and revenue-raising. The Court grants summary judgment to Defendant as to Count I.

COUNT II—UNFAIR COMPETITION

COUNT III—EXCLUSIVE JURISDIC-
TION OF AUTHORITY TO REGULATE
LIMOUSINES AT TAMPA INTERNA-
TIONAL AIRPORT

The Court finds that the reasoning of the
Eleventh Circuit in *Commuter Transpor-
tation, supra,* controls both issues, and
dismisses both as a matter of law.

COUNT IV—COMMON LAW UNFAIR
COMPETITION

COUNT V—COMMON LAW TORTIOUS
INTERFERENCE WITH ADVANTA-
GEOUS BUSINESS RELATIONSHIPS

The Court remands Counts IV and V for
proceedings in state court. Accordingly, it
is

ORDERED that Defendant's motion for
summary judgment as to Count I be grant-
ed. It is further

ORDERED that Plaintiff's motion for
partial summary judgment be denied. It is
further

ORDERED that Plaintiff's request for
oral argument be denied. It is further

ORDERED that Defendant's motion to
modify consent order be denied as moot.
It is further

ORDERED that Defendant's motion to
dismiss Counts II and III be granted. It is
further

ORDERED that the Clerk is directed to
enter final judgment implementing this Or-
der and dismissing this case.