937 F.2d 1502
 1991-1 Trade Cases 69,484
 ALLRIGHT COLORADO, INC.; Continental Airport Parking, Inc.;
Ennis, Inc., dba Monaco Parking; Phchodaux Howdy
International Group, Inc., dba Premier Parking Inc.,
Plaintiffs-Appellants, Cross-Appellees,
v.
The CITY AND COUNTY OF DENVER, a governmental subdivision of
State of Colorado dba SMART; John Mrozek, in his capacity
as manager of Public Works; George Doughty, in his capacity
as director of Aviation of Stapleton, Defendants-Appellees,
Cross-Appellants.
 Nos. 89-1379, 90-1003.
 United States Court of Appeals,
Tenth Circuit.
 July 1, 1991.
 
 Richard L. Shearer (Langdon J. Jorgensen, with him on the briefs), Calkins, Kramer, Grimshaw & Harring, Denver, Colo., for plaintiffs-appellants, cross-appellees.
 Helen Eckardt Raabe, Asst. City Atty. (Dean Speirs, Asst. City Atty., and B. Lawrence Theis, Walters & Theis, with her on the briefs), Denver, Colo., for defendants-appellees, cross-appellants.
 Before McKAY, ANDERSON, Circuit Judges, and CHRISTENSEN,* District Judge.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Plaintiffs, four corporations which provide remote lot parking and courtesy shuttle bus service to airline customers at Stapleton International Airport ("Stapleton" or "Airport") in Denver, Colorado, appeal the dismissal of their antitrust and 42 U.S.C. Sec. 1983 suit against the City and County of Denver ("Denver" or "City") and two city employees. They alleged that Denver's proposed adoption of new Rules and Regulations imposing certain fees on the operation of their shuttle buses and requiring them to sign certain agreements, in conjunction with other alleged restrictions on plaintiffs' operations at Stapleton, violated section two of the Sherman Act, 15 U.S.C. Sec. 2, as well as the equal protection, due process and commerce clauses of the United States Constitution and certain provisions of Denver's City Charter. Upon the conclusion of plaintiffs' case in their trial to the court, the district court granted defendants' Fed.R.Civ.P. 41(b) motion to dismiss. Plaintiffs appealed that dismissal, and defendants cross-appealed the district court's refusal to find their actions immune from suit under the antitrust laws. We affirm.
 
 BACKGROUND
 
 2
 Plaintiffs (Allright Colorado, Inc., Continental Airport Parking, Inc., Ennis, Inc. d/b/a Monaco Parking, and Phchodaux Howdy International Group, Inc., d/b/a Premier Parking, Inc.) are Colorado corporations engaged in the business of operating remote parking lots at Stapleton and providing a courtesy shuttle bus service between those lots and the terminals at Stapleton. Allright has been engaged in that business since 1978. The other plaintiffs entered the business in 1985 and 1986. Stapleton is a proprietary enterprise owned and operated by Denver, a governmental subdivision of the State of Colorado. Defendant John Mrozek was the Manager of Denver's Department of Public Works at the time of trial. His duties included the management and operation of the Airport and the public roads adjacent to the Airport. Defendant George Doughty was the Director of Aviation for Stapleton. Doughty's responsibilities included the immediate management and operation of the Airport, including adjacent public roads. Mrozek was Doughty's supervisor.
 
 
 3
 This case concerns Denver's operation of parking lots and an accompanying shuttle bus service at Stapleton. In its early stages, the shuttle bus parking service at Stapleton was exclusively offered by private parties such as plaintiffs.[1] In 1983, Denver began operation of Shuttle Lot # 1 with accompanying shuttle bus service. It established Shuttle Lot # 2 in 1984 and Shuttle Lot # 3 in 1985. Shuttle Lot # 1 was dedicated to other uses in 1986. Its shuttle bus service is called SMART (Stapleton Mass Rapid Transit). While SMART and plaintiffs now charge comparable prices for daily parking, evidence at trial showed that in 1985 and 1986, SMART charged somewhat less than plaintiffs.
 
 
 4
 Initially, plaintiffs had unrestricted access to the Stapleton terminal, using the roads adjacent to the airport.[2] Although the evidence was not clear as to exact dates, at some point after plaintiffs commenced business, Denver imposed restrictions on all commercial operators at Stapleton, requiring them to use certain designated commercial lanes and pick-up locations. In late 1984 or early 1985, Stapleton imposed permit fees on plaintiffs' activities at the Airport. SMART buses were exempted from the permit fees. Subsequently, Denver required plaintiffs to use different access routes than its own shuttle buses used, and allocated pick-up locations at the terminal. Plaintiffs allege, and the district court found, that SMART buses have the more favorable pick-up locations. Additionally, the district court found that the routes imposed on plaintiffs' shuttle buses are less favorable.[3] In 1988, Denver installed access gates on the commercial lanes and required all commercial operators to use electronic cards to access the commercial lanes.
 
 
 5
 In addition to the above restrictions on plaintiffs' activities at Stapleton, Denver has allegedly further disadvantaged plaintiffs by granting to its own SMART buses the exclusive right to advertise on Stapleton property, the exclusive right to use public rights-of-way for signs directing travellers to its own lots, the exclusive right to use the Stapleton information radio to advertise, and a more favorable representation on the Airport directory. The evidence presented at trial established that, during this time period, SMART experienced a significant increase in its share of the remote shuttle bus parking market, whereas plaintiffs experienced a decline.[4]
 
 
 6
 In 1989, defendants took the actions which prompted this lawsuit. By letter dated May 17, 1989, they informed plaintiffs that they planned to adopt new Rules and Regulations which would: (1) impose access fees on commercial operators at the airport, including plaintiffs; and (2) require commercial operators such as plaintiffs to sign permit agreements in which they would consent to pay the new access fees or lose their access cards and be thereby barred from the airport terminal. Denver's own SMART buses would not be required to pay any such fees. The fees were based upon the time spent at the lower level of the Airport terminal building where passengers were picked up. Thus, plaintiffs' shuttle buses incurred added costs if they lingered at the terminal to assure that their buses were always available for travellers. Because it was exempt from the fees, SMART could always have a bus waiting for travellers. The access fee imposed on plaintiffs was approximately 50% higher than that imposed on certain other private shuttle bus operators (i.e. shuttle bus operators between hotels, ski resorts, car rental companies or other comparable businesses and the airport) who use the same commercial lanes and routes. The permit agreement also required plaintiffs to disclose financial information and customer lists to the Manager of Public Works, and imposed certain other allegedly onerous burdens on plaintiffs. The Department of Public Works adopted the Rules and Regulations on June 12, 1989 and they were to take effect on July 1, 1989.
 
 
 7
 Plaintiffs filed this lawsuit on June 20, 1989, alleging that, by all of the above actions, "the City has consistently used its governmental authority and power to systematically bestow unfair and illegal competitive advantages upon SMART, to the detriment and exclusion of the Plaintiffs." Complaint at 5, R.Vol. I Tab 1. Plaintiffs argue that defendants engaged in those activities in order to monopolize or attempt to monopolize the Airport parking market in violation of section two of the Sherman Act, 15 U.S.C. Sec. 2.[5] They further allege that the permit and access fees constitute an undue burden on interstate commerce, and that the allegedly unfavorable treatment of plaintiffs violates the due process and equal protection clauses of the Fourteenth Amendment. Finally, they argue that the fees are in fact taxes which were not properly enacted under the City Charter, and that the permit agreements are adhesion contracts invalid as contrary to public policy. They sought injunctive relief, damages and attorneys' fees and costs.[6]
 
 
 8
 Defendants filed a Fed.R.Civ.P. 12(b)(6) motion to dismiss, followed by a motion for summary judgment. Trial to the court was held on November 20-22, 1989. At the close of plaintiffs' case, the court granted defendants' Fed.R.Civ.P. 41(b) motion to dismiss on the ground that plaintiffs had "shown no right to relief." It ruled that plaintiffs had failed to establish that there was a dangerous probability of success in monopolizing the relevant market and that defendants had a specific intent to monopolize. Plaintiffs' attempt to monopolize claim was therefore dismissed. The court held that plaintiffs' monopolization claim failed apparently because plaintiffs failed to prove monopoly power.[7]
 
 
 9
 The court rejected plaintiffs' due process and equal protection claims because it concluded defendants' classification of commercial operators for the purposes of different fee schedules and other disparate treatment satisfied the rational basis test. Plaintiffs do not appear to challenge the dismissal of their interstate commerce claim or their pendent state law claims. The court found against defendants, however, on their claim of immunity under the state action immunity doctrine of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Plaintiffs timely appealed the dismissal of their claims and defendants cross-appealed the court's decision that defendants were not immune from antitrust suit.
 
 DISCUSSION
 
 10
 I. State Action Immunity.
 
 
 11
 Defendants cross-appeal the district court's refusal to hold them immune on state action immunity grounds from an antitrust suit, arguing that the state has expressly authorized local entities to own and operate airports, including all facilities and operations, such as parking, necessary thereto.
 
 
 12
 Municipalities are shielded from antitrust liability for allegedly anticompetitive acts "authorized by the State 'pursuant to state policy to displace competition with regulation or monopoly public service.' " Hallie v. City of Eau Claire, 471 U.S. 34, 39, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985) (quoting City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978)); see also Community Communications Co. v. City of Boulder, 455 U.S. 40, 51-52, 102 S.Ct. 835, 840-841, 70 L.Ed.2d 810 (1982); Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth., 933 F.2d 853 (10th Cir.1991); Jacobs, Visconsi & Jacobs Co. v. City of Lawrence, 927 F.2d 1111, 1120 (10th Cir.1991); Oberndorf v. City and County of Denver, 900 F.2d 1434 (10th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). This court follows a two-part test for evaluating municipal state action immunity. "First, the state legislature must have authorized the action under challenge. Second, the legislature must have intended to displace competition with regulation." Jacobs, Visconsi & Jacobs Co., 927 F.2d at 1120; see also Buckley Constr., Inc., 933 F.2d at 855; Oberndorf, 900 F.2d at 1438.[8] Express authorization of the allegedly anticompetitive acts is not required. Hallie, 471 U.S. at 42, 105 S.Ct. at 1718 ("[i]t is not necessary ... for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects"). It is sufficient if the anticompetitive conduct "is a forseeable result" of the stated policy or it is "clear that anticompetitive effects logically would result from [the] broad authority to regulate." Id. Nonetheless, there must be a "clearly articulated and affirmatively expressed" state policy to displace competition. Id. at 44, 105 S.Ct. at 1719.
 
 
 13
 The two most recent Supreme Court decisions on this subject help define the parameters of the municipal immunity inquiry. In Hallie, Wisconsin statutes granted the authority to cities to construct, add to, alter and repair sewage systems, to determine the areas in which the sewage systems would operate and to refuse to provide service outside those areas. The statutes further empowered the State Department of Natural Resources to require cities to construct their sewage systems so that unincorporated areas could connect to them provided the landowners in the unincorporated areas agreed to become annexed to the cities. Four unincorporated towns adjacent to the city of Eau Claire alleged that the city violated the antitrust laws by refusing to supply sewage treatment services to the residents of the towns unless a majority of those residents voted to become annexed to the city and to use the city's sewage collection and transportation services. The Court held that the city was immune.
 
 
 14
 [T]he statutes clearly contemplate that a city may engage in anticompetitive conduct. Such conduct is a forseeable result of empowering the City to refuse to serve unannexed areas.... [I]t is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate.
 
 
 15
 Hallie, 471 U.S. at 42, 105 S.Ct. at 1718.
 
 
 16
 By contrast, in Boulder, the Court held that the Home Rule Amendment of the Colorado constitution conferring upon municipalities the general authority to govern local affairs was merely a "neutral" expression of state policy, which did not sufficiently articulate a state policy to displace competition:
 
 
 17
 But plainly the requirement of "clear articulation and affirmative expression" is not satisfied when the State's position is one of mere neutrality respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have "contemplated" the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as "comprehended within the powers granted," since the term, "granted," necessarily implies an affirmative addressing of the subject by the State. The State did not do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality.
 
 
 18
 Boulder, 455 U.S. at 55, 102 S.Ct. at 842 (emphasis original). Thus, an ordinance passed by the city of Boulder imposing a moratorium on a cable television company's expansion was not protected from antitrust challenge by the state action doctrine.
 
 
 19
 We therefore examine the relevant statutes to determine whether they authorized the actions challenged and whether they evidence a "clearly articulated and affirmatively expressed" policy to displace competition in the provision of off-airport shuttle bus parking.[9]
 
 Those statutes provide as follows:
 
 20
 41-4-101. Operation a governmental function. The acquisition of any lands for the purpose of establishing airports or other air navigation facilities; ... the acquisition, establishment, construction, enlargement, improvement, maintenance, equipment, and operation of airports ...; and the exercise of any other powers granted in this part 1 to any county, city and county, city ... are hereby declared to be public governmental functions....
 
 
 21
 Colo.Rev.Stat. Sec. 41-4-101. Section 41-4-106 authorizes the operation of airports by counties:
 
 
 22
 41-4-106. Operation of airports. In connection with the erection, maintenance, and operation of any such airport or navigation facilities, any county has the power and jurisdiction ... to regulate the receipt, deposit, and removal and the embarkation of passengers or property to or from such airports; to exact and require charges, fees, and tolls, ...; to lease or assign for operation such space or area ... necessary or useful in connection therewith; ... to provide rules and regulations governing the use of such airport and facilities and the use of other property and means of transportation within or over said airport....
 
 
 23
 Colo.Rev.Stat. Sec. 41-4-106.[10] Sections 41-4-201 and 41-4-204 generally provide comparable authority to cities to own, maintain and operate airports. Colo.Rev.Stat. Sec. 31-15-711(f) provides authority for cities to maintain and operate public parking facilities.
 
 
 24
 Defendants assert that those statutes clearly and affirmatively express a state policy to displace competition in the operation of airports and related activities, including off-airport shuttle bus parking. We agree.
 
 
 25
 As the Supreme Court did in Hallie, we turn to the specific language of the statutes. Section 41-4-106 clearly confers upon counties a broad authority to regulate airport activities, including the power "to regulate the receipt, deposit, and removal and the embarkation of passengers or property to or from such airports; to exact and require charges, fees, and tolls ...; to lease or assign for operation such space or area ... necessary or useful in connection therewith; ... to provide rules and regulations governing the use of such airport and facilities and the use of other property and means of transportation within or over said airport." See also Sec. 41-4-204 (same authority granted to cities). That is precisely what the City has done in this case--it has regulated the removal and embarkation of passengers to and from the airport; it has exacted fees and charges; it has assigned areas of operation to plaintiffs; it has provided rules and regulations governing the use of the airport and the means of transportation within the airport. Further, it is certainly a "forseeable result" of that broad authority to regulate that competition in the provision of shuttle bus services between the Airport Terminal and off-airport parking lots would be displaced. Caselaw supports our conclusion.
 
 
 26
 As indicated, in Hallie itself, the Court found it "sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from the broad authority to regulate." Hallie, 471 U.S. at 42, 105 S.Ct. at 1718.
 
 
 27
 In Sterling Beef v. City of Fort Morgan, 810 F.2d 961 (10th Cir.1987), this court found immunity in an equally broad statutory scheme. The city of Fort Morgan, Colorado had a natural monopoly in the provision of natural gas. When Sterling Beef Company attempted to purchase natural gas for its meat processing plant at a cheaper price from a private company by connecting to that company's gas distribution system outside the city limits, Fort Morgan passed an ordinance making it unlawful for any person, without a permit or franchise from the city, to erect or operate "any natural gas pipeline ... or system ... within the city in order to sell or distribute or provide non-municipal gas ... to any user or consumer within the city; or ... to interconnect any building ... to any natural gas pipeline or system ... other than to the natural gas or electrical system of the City of Fort Morgan." Sterling Beef, 810 F.2d at 962.
 
 
 28
 In holding that the enactment of the ordinance was protected state action, this court relied largely on Colo.Rev.Stat. Sec. 31-15-707(a)(1) which granted municipalities the power:
 
 
 29
 [t]o acquire ... gasworks, and gas distribution systems for the distribution of gas of any kind ... or to authorize the erection, ownership, operation, and maintenance of such works and systems by others.
 
 
 30
 We held that that statute, along with "the related powers of the city provided by the state constitution and by statute on this same subject combine to detail all the powers necessary to permit the city to attain a monopolistic position as to gas distribution." Sterling Beef, 810 F.2d at 964. The challenged ordinance was "a forseeable consequence of the municipality's power over natural gas distribution." Id.
 
 
 31
 Similarly, Denver's challenged rules and regulations governing shuttle bus services are a foreseeable consequence of its statutory power to regulate access to and use of the airport. See also Interface Group, Inc. v. Mass. Port Auth., 816 F.2d 9, 13 (1st Cir.1987) (statutes permitting Port Authority to "contract with any person ... desiring the use of any part of [the] airport ... to fix the terms, conditions, rents and rates or charges for such use ..." authorized policies governing "which airlines are to use which terminals, where and how they are to be serviced, and whether or when they can taxi from one terminal to another"); Commuter Transp. Sys., Inc. v. Hillsborough City Aviation Auth., 801 F.2d 1286, 1289 (11th Cir.1986) ("The Authority was authorized by the state to negotiate contracts with businesses as it may deem necessary for the development and expansion of the airport and to grant concessions, upon such terms and conditions as it shall deem proper. It is clear that The Authority's actions [restricting the number of contracts with limousine operators] was contemplated by the state legislature and under Parker, The Authority is immunized."); Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91, 96 (2nd Cir.) ("In view of this broad statutory authority to enter into exclusive or non-exclusive contracts, it was a forseeable result that the Town would assert the authority to deny appellant year-long operating rights."), cert. denied, 479 U.S. 872, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986); Indep. Taxicab Drivers' Employees v. Greater Houston Transp. Co., 760 F.2d 607, 610 (5th Cir.) ("While the [statutory] provision falls short of expressly mentioning the establishment of ground transportation services, the statute's broad phrasing is a strong indication of the state's desire to abdicate in favor of municipal prescience with regard to airport management."), cert. denied, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985); Hillman Flying Serv., Inc. v. City of Roanoke, 652 F.Supp. 1142, 1145-46 (W.D.Va.1987) (statute granting municipalities the authority to "acquire, construct, maintain, and operate airports and related structures, properties and facilities" immunized grant of the exclusive right to sell aviation fuel to one vendor), aff'd, 846 F.2d 71 (4th Cir.1988).[11]
 
 
 32
 Plaintiffs make much of the fact that in this case, the City is also in some sense a competitor of plaintiffs.[12] They also suggest that the City's activities here go far beyond what may have been authorized by statute with respect to airport parking, and that the defendants' motivations may have been anticompetitive. None of these arguments persuade us that the City should be subject to antitrust liability for its actions in this case.
 
 
 33
 The fact that the City is also in some sense a competitor of plaintiffs does not alter the basic test for state action immunity nor does it diminish the City's regulatory authority over the Airport and plaintiffs' activities. The question remains whether there is a clear and express state policy to displace competition with regulation and authorizing the challenged activities. We have held that there is. The City's additional status as a possible competitor, or its possible engagement in a "proprietary" activity, is not determinative. See note 11, supra. Cf. City of Columbia v. Omni Outdoor Advertising, Inc., 111 S.Ct. at 1351 ("this [state action] immunity does not necessarily obtain where the State acts not in a regulatory capacity but as a commercial participant in a given market").
 
 
 34
 Similarly, plaintiffs' allegation that defendants may have gone beyond the statutory authority granted them, or that they may have been motivated by anticompetitive intentions, is unpersuasive. See City of Columbia v. Omni Outdoor Advertising, Inc., --- U.S. ----, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). As we noted in Buckley Constr., Inc., 933 F.2d at 856, "[o]nce a municipality establishes it is entitled to state action immunity, the subjective motivation of the actors involved in the decisionmaking process should not come into play." We agree with the Ninth Circuit, which has stated:
 
 
 35
 The availability of Parker immunity ... does not depend on the subjective motivation of the individual actors, but rather on the satisfaction of the objective standards set forth in Parker and authorities which interpret it. This must be so if the state action exemption is to remain faithful to its foundations in federalism and state sovereignty. A contrary conclusion would compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of defendants.
 
 
 36
 Boone v. Redevelopment Agency, 841 F.2d 886, 892 (9th Cir.), cert. denied, 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988) (quoting Llewellyn v. Crothers, 765 F.2d 769, 774 (9th Cir.1985)); see also Omni Outdoor Advertising, Inc., 111 S.Ct. at 1352-53. For the same reason we reject the argument that alleged errors or abuses in the implementation of state law should expose the City to antitrust liability. See Omni Outdoor Advertising, Inc., 111 S.Ct. at 1349-50; Buckley Constr., Inc., 933 F.2d at 856; Interface Group, Inc. v. Mass. Port Auth., 816 F.2d 9, 13-14 (1st Cir.1987); Llewellyn, 765 F.2d at 1334; Scott v. City of Sioux City, 736 F.2d 1207 (8th Cir.1984), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); P. Areeda & H. Hovencamp, Antitrust Law, p 212.3b (Supp.1990); cf. Lease Lights, Inc. v. Pub. Serv. Co. of Oklahoma, 849 F.2d 1330, 1334 (10th Cir.1988) ("The constitutional invalidity of the attempted state regulation is not an appropriate basis for disregarding state action immunity."), cert. denied, 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 807 (1989).
 
 
 37
 We therefore reverse the district court's conclusion that defendants' activities were not immune from antitrust challenge. Accordingly, we need not address the merits of the antitrust claims.
 
 
 38
 II. Equal Protection and Due Process Claims.
 
 
 39
 Plaintiffs claim that the City created three different classifications of shuttle bus services: plaintiffs' private off-airport parking shuttle bus service; hotel, motel, ski resort and other comparable facility shuttle bus service; and SMART shuttle bus service. The evidence showed, and the district court found, that the challenged rules and regulations imposed on plaintiffs a fee which was 50% higher than the fee imposed on the hotel, motel and ski resort shuttle bus services. SMART buses were assessed no fee. Plaintiffs claim that this disparate treatment of similarly situated shuttle bus services was arbitrary and capricious and violates the equal protection and due process clauses. The district court rejected this argument, concluding that the City had a rational basis for treating the three groups differently. We affirm.
 
 
 40
 When a plaintiff challenges economic or commercial legislation as violating the equal protection or due process clauses, the state or municipal defendant need only show that the regulation is rationally related to a legitimate state interest. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam); Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Buckley Constr., Inc., 933 F.2d at 859; Jacobs, Visconsi & Jacobs Co. v. City of Lawrence, 927 F.2d 1111 (10th Cir.1991); Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 825 F.2d 367 (11th Cir.1987), cert. denied, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988); Murphy v. Matheson, 742 F.2d 564 (10th Cir.1984). Governmental bodies have "wide latitude in enacting social and economic legislation; the federal courts do not sit as arbiters of the wisdom or utility of these laws." Alamo Rent-A-Car, Inc., 825 F.2d at 370; see also Silverstein v. Gwinnett Hosp. Auth., 861 F.2d 1560, 1564 (11th Cir.1988); Murphy v. Matheson, 742 F.2d at 575. We also note we need not satisfy ourselves that the challenged rules will in fact further their articulated purposes; it is sufficient if "the legislature could rationally have concluded that the purposes would be achieved." Alamo Rent-A-Car, 825 F.2d at 372 (citing Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981)); see also Clements v. Fashing, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982) ("Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them."); Swin Resource Sys., Inc. v. Lycoming County, 883 F.2d 245, 255-56 (3rd Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990).
 
 
 41
 We consider first whether the challenged classifications have a legitimate purpose. The challenged rules and regulations state that they were enacted "to ensure the traveling public access to an efficient and orderly ground transportation system and to ensure efficient use of the limited capacity of Airport roadways and parking and loading facilities;" to "meet the needs for operating the Denver Municipal Airport System including without limitation the expenses for bonded indebtedness of the system, its operating expenses, and expenses for construction, reconstruction, replacement, repair and any similar activity for any facility within the system;" "to retire debts" and to "pay for Airport construction, reconstruction, replacement, repair and operating expenses;" to "reasonably apportion these expenses among concessionaires, businesses and other users of the facilities;" and "to recoup revenue the Airport may be losing and preserve its existing revenue." These are legitimate governmental purposes. See Alamo Rent-A-Car, 825 F.2d at 373 (raising revenue is a legitimate and substantial governmental objective); Gannett Satellite Information Network v. Metro. Transp. Auth., 745 F.2d 767 (2d Cir.1984); Astro Limousine Serv., Inc. v. Hillsborough County Aviation Auth., 678 F.Supp. 1561, 1565 (M.D.Fla.1988), aff'd, 862 F.2d 877 (11th Cir.1988). Promoting the efficient use of Airport space and facilities is undoubtedly a legitimate governmental purpose.
 
 
 42
 Accordingly, we must determine whether there is a rational basis for believing that the classifications employed will further those legitimate purposes. There are two relevant comparisons here: plaintiffs vis-a-vis hotel, motel and ski resort shuttle bus operators and plaintiffs vis-a-vis SMART buses. We consider first the different treatment of plaintiffs and hotel, motel and ski resort services.
 
 
 43
 Plaintiffs argue there is no rational basis for charging them a fee 50% higher than the fee imposed on those other shuttle bus operators, whose use of the Airport, plaintiffs argue, is identical. The district court found that plaintiffs' shuttle bus service is "different" from the service provided by buses connecting the Airport with hotels, motels and ski resorts. Defendants argue and the district court also found that plaintiffs derive a "greater benefit" from the Airport than do hotel/motel/ski resort shuttle bus services. Plaintiffs contend it is irrational to make such an assumption without engaging in studies to prove the greater benefit. We disagree.
 
 
 44
 A very similar contention was made in Alamo Rent-A-Car, 825 F.2d 367 (11th Cir.1987), where an off-airport car rental company challenged the imposition of higher user fees on its own operations than on hotel and motel courtesy vehicles. The court held such different fees did not violate the equal protection clause:
 
 
 45
 Differences in the types of business conducted by these companies is certainly a factor in equal protection analysis, and in some cases this distinction alone may be sufficient to uphold the challenged legislation.
 
 
 46
 Alamo Rent-A-Car, 825 F.2d at 370. Even assuming the businesses were not materially different for the purpose of imposing the challenged fees, the court concluded that "[t]he distinctions ... drawn are based upon [the Airport Authority's] rational assessment of the relative benefits and the extent of use of each category of vehicles that enter the airport. In establishing these classifications, the Authority need not achieve perfection or mathematical exactitude." Id. at 371.[13] See also Vance v. Bradley, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). We reach the same conclusion here.
 
 
 47
 We review the district court's factual findings under the clearly erroneous standard. Woods v. North Am. Rockwell Corp., 480 F.2d 644, 646 (10th Cir.1973). We cannot say that the findings that plaintiffs are engaged in a "different" service and that they derive a "greater benefit" from the Airport are clearly erroneous.[14] Given those findings, there is a rational basis for believing that the different treatment of plaintiffs' service compared with other shuttle bus services furthers the City's legitimate interests of "reasonably apportion[ing] [airport] expenses among ... users of the facilities" and "ensur[ing] the traveling public access to an efficient and orderly ground transportation system." See Alamo Rent-A-Car, 825 F.2d at 370-71.
 
 
 48
 Plaintiffs also challenge the imposition of fees on their services as compared with the exemption from any fees of the City's own SMART vehicles. We also affirm the district court's conclusion that there is a rational basis for believing that this distinction will further the City's legitimate interests. As the district court specifically found, SMART buses perform additional functions in that they also transport passengers between concourses. Thus, SMART buses are arguably engaged in a "different line[ ] of business." Alamo Rent-A-Car, 825 F.2d at 370.
 
 
 49
 Furthermore, the City as a governmental entity can be treated differently for equal protection purposes than a private commercial entity. See Puget Sound Co. v. City of Seattle, 291 U.S. 619, 54 S.Ct. 542, 78 L.Ed. 1025 (1933); see also City of Pittsburgh v. Alco Parking Corp., 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974).[15]
 
 
 50
 Finally, as defendants argue, they could rationally conclude that SMART buses should be exempt from the fee because the City already receives substantial revenue from the City's parking operations at the airport. Thus, no equal protection violation follows from the decision not to impose an additional user fee on the City's parking lot shuttle service. See Evansville-Vanderburgh v. Delta Airlines, 405 U.S. 707, 718-19 and note 13, 92 S.Ct. 1349, 1356-57 and note 13, 31 L.Ed.2d 620 (1972).
 
 CONCLUSION
 
 51
 For the foregoing reasons, we AFFIRM the district court's grant of defendants' Rule 41(b) motion to dismiss.
 
 
 
 *
 Honorable A. Sherman Christensen, Senior Judge, United States District Court, District of Utah, sitting by designation
 
 
 [1]
 There was some testimony that the City had for some time operated a remote parking lot which was used as an overflow lot at peak times
 
 
 [2]
 Those roads are public rights-of-way. See City and County of Denver v. Publix Cab Co., 135 Colo. 132, 308 P.2d 1016 (1957)
 
 
 [3]
 The district court found that "there's a doubling back which both affects the time, the convenience of the passengers, and the costs to the plaintiffs of running those shuttles." Transcript of Ruling of the Court at 9
 
 
 [4]
 Plaintiffs' expert, Dean C. Coddington, prepared a "Market Analysis and Impact Assessment of Shuttle Bus Parking, Stapleton International Airport." Plaintiffs' Exhibit 100, Addendum Tab 100. The district court incorporated by reference the relevant portions of that Exhibit. That Exhibit showed that, in 1984, plaintiff Allright had 62.1% of the off-site parking market, plaintiff Monaco had 37.4% of that market, and SMART and plaintiffs Premier and Continental had 0%. By 1989, SMART's share had increased to 45%, whereas Allright's had declined to 24.1%, Monaco's had declined to 18.3% and Premier and Continental had market shares of 4.9% and 7.7% respectively. Mr. Coddington projected that by 1994, SMART would have more than 50% of that market, whereas the four plaintiffs would have less than 50%. The Exhibit also included an analysis of the impact of SMART on plaintiffs' revenues, and an analysis of the marketing efforts of SMART and plaintiffs
 
 
 [5]
 They initially also alleged a violation of Colorado state antitrust laws, but voluntarily dismissed that claim before trial
 
 
 [6]
 Simultaneously with their complaint, plaintiffs filed a motion for a temporary restraining order, which resulted in a hearing, converted by agreement of the parties to a hearing for a preliminary injunction. The hearing was, however, continued because the parties reached an interim agreement to not require payment of the new fees or require plaintiffs to sign the permit agreement until January 1, 1990. The fees are nonetheless accruing
 
 
 [7]
 The court ruled from the bench and did not reduce its ruling to writing. The court's reasoning for rejecting plaintiffs' monopolization claim is not completely clear. The court stated:
 Now, the evidence does not establish that Denver is a monopolist here and in this aspect of the analysis, it is important, I think, to bring in the limitations on what Denver can do as a government, so in this sense there is a necessity, I think, to overlap the principles and recognize that Denver can't be a monopolist and, as I said in colloquy with plaintiffs' counsel, Denver doesn't claim and certainly doesn't have the power to simply preclude the plaintiffs from accessing this airport by saying, "We are going to be the exclusive shuttle parking services provider for Stapleton International Airport." It can't do that because of other limitations on it as a government, which, of course, involves the concepts in these other claims.
 So in a very real sense, here I have to accept the plaintiffs' view that there is a confluence of principles because they can't become a monopoly in that way, and additionally, as we'll see in a moment, they can't use their ability to extract charges as conditions for the entry here to an extent that is unreasonable; in other words, there are limits to the rates that they can charge, the fees for access and they're the very limits that are being claimed in the other claims for relief, and that's another reason why the city can't be in the position of a monopolist with respect to this service in this market. Therefore, plaintiffs have failed to prove a Section II, a Sherman II violation in this case.
 Transcript of Ruling of the Court at 11-12.
 
 
 [8]
 Oberndorf was the first opinion in this circuit to frame the municipal immunity question in terms of two parts. We there noted that "we must consider two prerequisites to proper application of the state action exception to municipal action." 900 F.2d at 1438. Because in that case the Colorado Urban Renewal Law manifestly evidenced a clearly articulated and expressly stated policy to displace competition, we focused our inquiry on whether the City's actions were authorized by that law. In Jacobs, Visconsi & Jacobs Co., we called the inquiry a "two-part test." 927 F.2d at 1120. In practice, of course, the two parts will not always have equal prominence. See Oberndorf, 900 F.2d at 1438-39. In City of Columbia v. Omni Outdoor Advertising, Inc., --- U.S. ----, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Supreme Court recently stated that the inquiry into municipal "authority to regulate" will not be an exacting one:
 [I]n order to prevent Parker from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law.... It suffices for the present to conclude that here no more is needed to establish, for Parker purposes, the city's authority to regulate than its unquestioned zoning power over the size, location, and spacing of billboards.
 
 
 [111]
 S.Ct. at 1350. The two parts of the inquiry are designed to answer the central question--whether there is a "clearly articulated and affirmatively expressed policy" to displace competition. Hallie, 471 U.S. at 44, 105 S.Ct. at 1719
 
 
 [9]
 We reject plaintiffs' argument that Denver is authorized to own and operate Stapleton by Article XX of the Colorado constitution, the "home rule" provision, instead of by other statutory provisions more specifically relating to airports. In Sterling Beef Co. v. City of Fort Morgan, 810 F.2d 961 (10th Cir.1987), this court noted that the home rule provision in the constitution "round[s] out the basic authority" contained in the particular statute conferring upon the city of Fort Morgan, a home rule city, the authority to engage in the allegedly anticompetitive acts challenged there. The primary focus of our opinion in Sterling Beef was on the particular statutes, not the home rule provision. Under Boulder, it is clear that the grant of home rule authority by itself is an insufficient expression of state policy to displace competition
 
 
 [10]
 It appears that the city and county of Denver is considered a "county" under the Public Airport Authority Law, Colo.Rev.Stat. Secs. 41-3-101 to -108
 
 
 [11]
 Defendants also rely on our opinion in Pueblo Aircraft Serv. v. City of Pueblo, 679 F.2d 805 (10th Cir.1982), cert. denied, 459 U.S. 1126, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983), in which we held that the city of Pueblo, Colorado was immune from antitrust liability in its dealings with fixed base operators at its municipal airport. We did so in reliance upon Colo.Rev.Stat. Sec. 41-4-101, upon which defendants in this case also rely, and which, as indicated above, states that the maintenance and operation of airports are "public governmental functions, exercised for a public purpose, and matters of public necessity." While noting that typically a municipal airport is properly viewed as a "proprietary" activity, in the face of an explicit statute such as section 41-4-101, we felt compelled in Pueblo Aircraft to recognize immunity for the operation of the Pueblo airport as a "public governmental function."
 We do not base our finding of immunity in this case on that statute or on the rationale of Pueblo Aircraft. The distinction between proprietary activities and governmental functions upon which our Pueblo Aircraft opinion was based has at times formed the basis for determinations of immunity. See, e.g., City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (Burger, C.J., concurring) (state authorization necessary for immunity because defendant municipalities in that case were engaged in "proprietary" activities); Padgett v. Louisville and Jefferson County Air Board, 492 F.2d 1258 (6th Cir.1974) (Air Board's award of contract to one taxicab company immune from antitrust challenge because Board "was exercising a valid governmental function to which the antitrust laws do not apply"); E.W. Wiggins Airways, Inc. v. Mass. Port Auth., 362 F.2d 52 (1st Cir.) (decision by Port Authority to enter into exclusive lease with fixed base operator was immune from antitrust challenge as "the exercise of a valid governmental function"), cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966). It appears to us that the distinction between proprietary and governmental functions has not been pursued in recent Supreme Court opinions. In Hallie, for example, the Court simply considered whether the relevant statutes contained the requisite clear and express authorization. It did not consider whether the city's actions were proprietary or governmental. See also P. Areeda & H. Hovencamp, Antitrust Law, p 212.2e (Supp.1990) (in criticizing Chief Justice Burger's position in his Lafayette concurrence, the authors noted that "decisions since Lafayette have essentially ignored any distinction between proprietary and other functions"); In Re Airport Car Rental Antitrust Litigation, 521 F.Supp. 568, 583 (N.D.Cal.1981) ("municipal antitrust liability does not turn on the distinction between commercial/proprietary and governmental activities.... If the opinions in Lafayette make anything clear, it is that this distinction was unacceptable to eight of the nine members of the Court."), aff'd, 693 F.2d 84 (9th Cir.1982), cert. denied, 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983). Cf. City of Columbia v. Omni Outdoor Advertising, Inc., --- U.S. ----, 111 S.Ct. 1344, 1351, 113 L.Ed.2d 382 (1991) (no conspiracy exception to state action immunity, with possible exception of when state acts "not in a regulatory capacity but as a commercial participant in a given market").
 
 
 [12]
 Plaintiffs' shuttle buses and the City's SMART buses do not, however, perform identical services. As the district court found, SMART buses perform the additional job of transporting passengers between concourses, and not just to remote parking lots
 
 
 [13]
 For example, the court noted that the Airport Authority could rationally conclude that hotel and motel operators would discontinue service if they were charged any higher fee, since the airport courtesy vehicle service is not an indispensible part of their business
 
 
 [14]
 As a further explanation for why it concluded that plaintiffs derive a greater benefit from the Airport, the district court noted that "[t]he plaintiffs clearly wouldn't be in business at all but for this airport, and their whole business is to provide the parking services for people explaning at this airport." Transcript of Ruling of the Court at 19-20. Shuttle bus services to hotels, resorts and ski resorts, by contrast, would still be in business even if the Airport, for example, banned all private shuttle bus services from the premises. Although they could not pick up passengers at the Airport, they could still provide a service to people travelling to hotels, motels or ski resorts, albeit from a different pick-up location
 
 
 [15]
 Additionally, as airport officials testified, defendants believed that it would be illogical to charge SMART buses the user fee because there would be no net gain of funds. Rather, the fee would be paid out from one part of the City's operations and paid into another. Exempting SMART buses from the fee is therefore consistent with the legitimate governmental objective of raising revenue