**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 22 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

DAVID CHARLES ZIMOMRA, on
behalf of himself and all others similarly
situated,

    Plaintiff-Appellant,

    v.

ALAMO RENT-A-CAR, INC.; AVIS,
INC.; BUDGET RENT A CAR
CORPORATION; DOLLAR RENT-A-
CAR SYSTEMS, INC.; HERTZ
CORPORATION; NATIONAL CAR
RENTAL SYSTEM, INC.; THRIFTY
RENT-A-CAR SYSTEMS, INC.;
VALUE RENT-A-CAR, INC.;
ENTERPRISE LEASING CO. OF
DENVER; NATIONAL CAR RENTAL,
named as National Car Rental, Inc.;
RESORT RENT-A-CAR, INC.;
STEAMBOAT SPRINGS RENTAL AND
LEASING, INC.; TRYND, INC.; TIARA
ENTERPRISES, INC.,

    Defendants-Appellees.

No. 96-1120
No. 96-1203

Appeal from United States District Court
for the District of Colorado
(D.C. No. 94-S-2148)

David Boies, of Boies & McInnis, Fairfax, Virginia (Steven M. Feder, of Bader,
Villanueva & Feder, Denver, Colorado, with him on the brief), for the appellant.

Terence C. Gill (Stanley L. Garnett and Stephen D. Gurr with him on the brief), of
Brownstein Hyatt Farber & Strickland, P.C., Denver, Colorado, for the appellees.

Before SEYMOUR, Chief Judge, HENRY and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

Plaintiff David C. Zimomra appeals the district court's dismissal of his consolidated class action complaints alleging federal antitrust claims, as well as various state law claims, against fourteen car rental companies operating at Stapleton International Airport (Stapleton) and Denver International Airport (DIA). We affirm.

I.

On November 8, 1993, the City and County of Denver enacted Denver Bond Ordinance No. 863 to help fund construction of car rental facilities at DIA. Pursuant to the ordinance, the City and County issued special facilities revenue bonds in the amount of $65,579,000 to fund construction. To ensure repayment of the bonds (repayment period runs from 1993 through 2000), Ordinance 863 requires all car rental companies awarded rights to operate at DIA, all of whom entered into special facilities and ground leases for their respective facilities, to charge and collect "usage fees" from their customers. Specifically, Section 3.4(a) of the ordinance provides that

> a Usage fee shall be charged and collected by each Company from the person entering into each motor vehicle rental agreement with the Company at Stapleton International Airport [predecessor to DIA] prior to the opening date of Denver International Airport for commercial business as established by the City, and after such opening date.

Appellant's append. at 81.

The daily usage fee was initially set at $2.98 and was to remain at that amount until October 1, 1994. Subsequent daily usage fees are to be established through the

interaction of a "Managing Committee," which is composed of a representative from each car rental company and an "Independent Consultant" appointed by the Managing Committee with the approval of the Manager of Public Works of the City and County of Denver or his designee. Section 3.4(b) of the ordinance provides:

> The Usage Fee for each 12-month period commencing October 1, 1994 shall be an amount determined by the Independent Consultant to be sufficient to produce revenues which, together with available Reserve Balances in the respective Company Revenue Accounts in the Car Rental Special Facilities Revenue Fund equal, in the aggregate, to 115% of the sum of the principal of and interest on the Bonds coming due in such 12-month period plus the reasonably expected Administrative Expenses for such 12-month period, deficiencies then existing in the Special City Reserve Fund, and payments to the City under [the provisions of Ordinance 863] for such period. In determining the amount of the Usage Fee for any period the Independent Consultant shall evaluate such factors as it shall deem necessary which may include, among other things, the number of transaction days experienced by the Companies for one or more previous years for the rental of motor vehicles subject to the payment of Concession Fees (or comparable information at Stapleton International Airport), the number of transaction days estimated by [the car rental companies] for such period for the rental of motor vehicles subject to the payment of Concession Fees, and an estimate of the number of origination and destination passengers at [DIA] for such period.

Appellant's append. at 82-83.

By July 1 of each year, the Independent Consultant is required to furnish a report to the City and County of Denver, the car rental companies, and the banks involved in funding the special revenue bonds, setting forth the amount of the proposed daily usage fee for the next 12-month period "which, in the opinion of the Independent Consultant, is necessary to produce the required Usage Fee receipts . . . , together with an explanation of the basis for determining such amount." Appellant's append. at 83 (Section 3.4(c)). Any recipient of the report is then allowed a two-week period in which to comment upon the proposed daily usage fee and, if there is no objection, the fee becomes effective on

October 1 of that year. If there is an objection, the Independent Consultant evaluates the objection and decides whether to recalculate the proposed daily usage fee.

The car rental companies deposit their collected usage fees in a "Car Rental Special Facilities Revenue Fund" on a monthly basis. Appellant's append. at 82 (Section 3.4(a)). In turn, the Car Rental Special Facilities Revenue Fund is used to pay the principal and interest on the bonds, as well as associated expenses. Any amounts remaining after the bonds are retired (in the year 2000) will go to the City and County of Denver and will constitute gross revenues of the airport system. Appellant's append. at 78-79, 91 (Sections 3.1 and 3.13).

Plaintiff is a resident of Fairfax, Virginia. On unspecified dates in 1993 and 1994, he allegedly rented cars at Stapleton and was charged a $2.98 daily usage fee in addition to the agreed-upon daily rental rates. On July 11, 1994, plaintiff filed a complaint in the United States District Court for the Eastern District of Virginia purporting to sue on behalf of "all persons in the United States . . . who have rented cars from any defendant at Denver's Stapleton Airport and were charged a $2.98 per day charge during the period from and including 1993 to present." Appellees' supp. append. at 6. Named as defendants in the complaint were eight car rental companies doing business at Stapleton. Plaintiff asserted claims under Section 1 of the Sherman Antitrust Act and Sections 4 and 6 of the Clayton Act, as well as state law claims of fraud and deceit, unjust enrichment, and negligent misrepresentation. He alleged the defendant car rental companies violated federal and state law by jointly agreeing to charge airport customers a uniform $2.98 daily usage fee in addition to their quoted rental prices.

The action was transferred to federal district court in Colorado on September 9, 1994. Plaintiff filed a second complaint in Colorado federal district court on November 9, 1994, naming six additional car rental companies as defendants. The allegations of the second complaint were substantially similar to those in the first complaint.

Defendants moved to dismiss both complaints. Although defendants acknowledged imposing a $2.98 daily usage fee on airport customers, they contended they were required to do so by Ordinance 863. Accordingly, defendants sought dismissal of plaintiff's antitrust claims on state action immunity grounds. After consolidating both actions, the district court issued an order on February 23, 1996, granting the pending dispositive motions and dismissing plaintiff's claims against all but one of the named defendants (Tiara Enterprises, Inc.). In so doing, the district court concluded plaintiff's antitrust claims against defendants were barred by the state action immunity doctrine. Having concluded defendants were immune from plaintiff's antitrust claims, the court declined to exercise supplemental jurisdiction over plaintiff's supplemental state law claims. On April 12, 1996, the remaining defendant, Tiara Enterprises, Inc., filed a motion to dismiss and the court granted the motion on April 17, 1996, for the same reasons as in its February 23, 1996 order.

II.

*State action immunity*

Plaintiff contends the district court erred in concluding defendants were immune from federal antitrust claims under the state action immunity doctrine. In particular, he contends Ordinance 863, upon which defendants and the court relied, was not enacted pursuant to a clearly articulated and affirmatively expressed state directive to displace

price competition in the car rental market.  Further, he contends even if the ordinance was enacted pursuant to such a state policy, defendants' conduct is not immune from antitrust laws because the City and County of Denver does not actively supervise the setting or modification of the daily usage fee.

The "state action immunity" doctrine originated in Parker v. Brown, 317 U.S. 341 (1943), and "'exempts qualifying state and local government regulation from federal antitrust, even if the regulation at issue compels an otherwise clear violation of the federal antitrust laws.'" Cost Management Services v. Washington Natural Gas Co., 99 F.3d 937, 941 (9th Cir. 1996) (quoting Hovenkamp, Federal Antitrust Policy: The Law of Competition and its Practice § 20.2, at 673 (West 1994)).  Although the doctrine was aimed at protecting state legislatures and state supreme courts acting in their legislative capacities, it can provide protection to other individuals or entities acting pursuant to state authorization.  See Hoover v. Ronwin, 466 U.S. 558, 568 (1984).  In such situations, however, "closer analysis is required" to determine whether antitrust immunity is appropriate.  Id.; Porter Testing Laboratory v. Board of Regents, 993 F.2d 768, 770 (10th Cir.), cert. denied, 510 U.S. 932 (1993).

In California Retail Liquor Dealers Ass'n v. Midcal Aluminum, 445 U.S. 97 (1980), the Supreme Court established a two-part test to determine whether alleged anticompetitive conduct on the part of a private party is immunized under the state action immunity doctrine.  First, "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy.'" Id. at 105 (quoting City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410 (1978)).  Second, "the policy must be 'actively supervised' by the State itself." Id.  Application of this "rigorous" test ensures

that <u>Parker</u> immunity is applied only where the "private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." <u>Patrick v. Burget</u>, 486 U.S. 94, 101 (1988).

In <u>Town of Hallie v. City of Eau Claire</u>, 471 U.S. 34, 46-47 (1985), the Supreme Court modified the <u>Midcal</u> test for cases involving municipalities, specifically holding municipalities need not satisfy the <u>Midcal</u> active state supervision requirement because "there is little or no danger that [a municipality] is involved in a private price-fixing arrangement." <u>Id.</u> The result is that a municipality can obtain exemption under the state action immunity doctrine by satisfying only the first prong of the <u>Midcal</u> test, i.e., by demonstrating it acted pursuant to "clearly articulated and affirmatively expressed" state policy. <u>Id.</u>

Here, the district court applied the two-part <u>Midcal</u> test and concluded the defendant car rental companies were entitled to state action immunity from plaintiff's federal antitrust claims. In reviewing the district court's decision, we apply a de novo standard. <u>See</u> <u>F.T.C. v. Hospital Bd. of Directors of Lee County</u>, 38 F.3d 1184, 1187 (11th Cir. 1994) (application of state action immunity doctrine is a question of law reviewed de novo); <u>Buckley Const. v. Shawnee Civic & Cultural Development Authority</u>, 933 F.2d 853, 855 (10th Cir. 1991).

*Which test to apply*

Our initial inquiry is whether this case should be analyzed under the two-prong <u>Midcal</u> test, which typically applies to private actors, or the single-prong <u>Town of Hallie</u> test, which applies to municipalities. Although the district court applied the <u>Midcal</u> test

without discussing the municipality/private actor issue, defendants argue on appeal that the Town of Hallie test is appropriate because the challenged usage fee is the result of action on the part of a municipality, i.e., the City and County of Denver.  More specifically, defendants argue "the anticompetitive conduct, if any, occurred when [the City and County of] Denver set the amount of the Usage Fee in the Bond Ordinance and required its collection from each car rental customer, not by way of the private car rental companies' compliance with the law."  Appellees' br. at 26.  Further, defendants contend the Town of Hallie test is appropriate because Ordinance 863 "does not permit any discretion on the part of the car rental companies in assessing or determining the amount of the Usage Fee."  Id.

We agree with defendants that state action immunity in this case is properly determined according to the Town of Hallie test.  In Patrick, the Supreme Court noted the active supervision prong of the Midcal test "requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy."  486 U.S. at 101.  Such active state review is clearly necessary where private defendants are empowered with some type of discretionary authority in connection with the anticompetitive acts (e.g., to determine price or rate structures).  Here, however, the named defendants have no such discretionary authority. Rather, the provisions of Ordinance 863 make clear that the City and County of Denver is the "effective decision maker" with respect to both the amount of the daily usage fee and imposition of the fee.  City Communications v. City of Detroit, 660 F. Supp. 932, 934-35 (E.D.Mich. 1987), aff'd, 888 F.2d 1081 (6th Cir. 1989).  Although plaintiff claims defendants have input into the amount of the daily usage fee in 1994-2000, the provisions

of the ordinance make it clear that ultimate control over the amount of the fee rests with the City and County of Denver. Specifically, the amount of the fee for those years must equal "115% of the sum of the principal of and interest on the Bonds coming due in such 12-month period plus the reasonably expected Administrative Expenses for such 12-month period, deficiencies then existing in the Special City Reserve Fund, and payments to the City under [the provisions of Ordinance 863]." Appellant's append. at 82. In our view, application of the active supervision prong is of little value under these circumstances because the challenged conduct is mandated and strictly controlled by the City and County of Denver via Ordinance 863. Stated differently, we see no need for the state to supervise defendants' conduct (and no need for the second prong of the Midcal test) because there is little, if any, risk of defendants doing anything other than complying with the City and County's mandate.

We further note that plaintiff could have named the City and County of Denver as a defendant (or even the sole defendant) in this action. Had he done so, it is clear we would have applied the single-pronged Town of Hallie test rather than the double-pronged Midcal test to determine whether the City and County of Denver was entitled to state action immunity. See Allright Colorado v. City and County of Denver, 937 F.2d 1502 (10th Cir.) (City and County of Denver named as defendant; court applied Town of Hallie test to determine immunity), cert. denied, 502 U.S. 983 (1991). We therefore find it inconsistent, when the same conduct is at issue (i.e., imposition of the daily usage fee), to apply one test to the City and County of Denver (the Town of Hallie test), and apply a different, more stringent test (the Midcal test), to the private defendants. Were we to apply different tests, the result could be that the City and County of Denver would be

entitled to immunity but the private defendants would not. More specifically, the City and County of Denver, the entity that enacted the ordinance and imposed the daily usage fee, could be immune from antitrust damages, while the car rental companies, all of whom were compelled to comply with the ordinance in order to lease space at DIA, could be liable to plaintiff for antitrust damages. Such a result would be illogical and inconsistent with Supreme Court precedent.

In Southern Motor Carriers Rate Conference v. United States, 471 U.S. 48, 58-59 (1985), the Supreme Court specifically emphasized that "[t]he success of an antitrust action should depend upon the nature of the activity challenged, rather than on the identity of the defendant." The implication of this holding, we believe, is that in cases such as the one at bar, where private parties are acting under the compulsion of a municipality or other political subdivision, the same test should apply to determine state action immunity regardless of who the named defendants are.

In somewhat similar circumstances, several circuit and district courts have held that once a municipality (or other governmental unit) is determined to be immune from antitrust liability, the immunity should be extended to include private parties acting under the direction of the municipality. Cine 42nd Street Theater Corp. v. Nederlander Organization, 790 F.2d 1032, 1048 (2d Cir.1986) (holding private party theater operators acting in concert with urban development corporation which acquired and leased theaters for urban redevelopment project enjoyed corporation's state action immunity from antitrust liability; court did not conduct separate state action analysis for private parties); Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, 810 F.2d 869, 878 (9th Cir. 1987) (association of individual taxi owner-operators could not be held liable under

-10-

Sherman Act for possessing exclusive franchise to provide taxi service from Oahu airport where state department of transportation had been granted state action immunity to grant franchise); City Communications, 660 F.Supp. at 935 ("once it is determined that the municipality is entitled to immunity from the antitrust laws, the private parties who are regulated by the municipality are also entitled to immunity as long as the 'effective decision maker' is the municipality rather than the private parties"). "Recognizing that the state action doctrine protects state action, not state actors, these courts reason that to allow suits against private parties for actions immunized as to municipalities would allow plaintiffs to circumvent the state action doctrine and challenge protected municipal decisions through artful pleading." Bloom v. Hennepin County, 783 F. Supp. 418, 427 (D.Minn. 1992) (extending state action immunity from state governmental unit to private party). Admittedly, there is a difference between the above-cited cases and the instant case in that the City and County of Denver has not been named as a defendant in this case. Nevertheless, we conclude plaintiff's "artful pleading" should not control which test we apply in determining antitrust immunity for the challenged conduct.

*Applying the Town of Hallie test*

In analyzing whether the State of Colorado articulated a clear and affirmative policy to allow the conduct at issue here, the district court looked to Articles 3 and 4 of Title 41 of the Colorado Revised Statutes, and to the County and Municipality Development Revenue Bond Act, C.R.S. § 29-3-101 et seq. We proceed to review these same statutes.

-11-

Article 3 of Title 41 of the Colorado Revised Statutes is known as the "Public Airport Authority Act" and provides cities, towns, and counties in Colorado with the right to create "airport authorities" for the "purpose of acquiring and improving airports, . . . and related facilities." C.R.S. § 41-3-102 (1996). The Act further provides airport authorities in Colorado with the power to "borrow money and . . . issue bonds payable in whole or in part from the income of the authority and otherwise secured to the extent permitted by law." C.R.S. § 41-3-106(e) (1996).

Article 4 of Title 41 of the Colorado Revised Statutes (which has no short title) governs airports in the State of Colorado. C.R.S. § 41-4-101 (1996) provides:

> The acquisition of any lands for the purpose of establishing airports or other air navigation facilities; the acquisition of airport protection privileges; the acquisition, establishment, construction, enlargement, improvement, maintenance, equipment, and operation of airports and other air navigation facilities; and the exercise of any other powers granted in this part 1 [of the Act] to any county, city and county, city, or town are . . . public governmental functions, exercised for a public purpose, and matters of public necessity.

C.R.S. § 41-4-106 (1996) provides that counties in Colorado have the "power and jurisdiction," in connection with the erection, maintenance, and operation of any airport,

> to regulate the receipt, deposit, and removal and the embarkation of passengers or property to or from such airports; to exact and require charges, fees, and tolls, together with a lien to enforce their payment; to lease or assign for operation such space or area, appurtenances, appliances, or other conveniences necessary or useful in connection therewith; . . . to provide rules and regulations governing the use of such airport and facilities and the use of other property and means of transportation within or over said airport.

C.R.S. § 41-4-112 (1996) authorizes any county in Colorado

> to rent or lease . . . any lands or interest in lands acquired by the county for the purposes set forth in this part 1 to any person, partnership, association, or corporation, either public or private, for commercial, industrial, or other purposes, for such periods of years and upon such terms and conditions as

are deemed in the best interests of the county by the board of county commissioners.

.

The second general statute cited by the district court was the County and Municipality Development Revenue Bond Act (Bond Act), C.R.S. § 29-3-101 et seq. C.R.S. § 29-3-102(1) (1996) provides it was the intent of the Colorado General Assembly "to authorize counties and municipalities to finance, acquire, own, lease, improve, and dispose of properties to the end that such counties and municipalities may be able to promote industry and develop trade or other economic activity." Similarly, C.R.S. § 29-3-102(3) provides it was the intent of the General Assembly to vest Colorado counties and municipalities "with all powers that may be necessary to enable them to accomplish such purposes, which powers shall in all respects be exercised for the benefit of the inhabitants of this state for the promotion of their health, safety, welfare, convenience, and prosperity." Finally, C.R.S. § 29-3-104(1)(a), (b), (c) (1996) specifically grants Colorado counties and municipalities with a variety of general powers, including the power to "improve and equip," to "finance" projects, to "enter into financing agreements with others for the purpose of providing revenues to pay the bonds authorized by" the Bond Act, and to "issue revenue bonds for the purpose of defraying the cost of financing, refinancing, acquiring, improving, and equipping any project, including the payment of principal and interest on such bonds."

In Allright, we found state action immunity in an identical section of Title 41, C.R.S. § 41-4-106. 937 F.2d at 1506-11. The plaintiffs in Allright, operators of off-airport shuttle bus parking services, filed suit against the City and County of Denver contending regulations governing shuttle bus services at Stapleton violated federal

antitrust laws. The district court dismissed plaintiffs' claims, concluding defendants were entitled to state action immunity. On appeal, we affirmed the district court's decision. In so doing, we cited C.R.S. §§ 41-4-101, 41-4-106, and 41-4-204, and specifically noted that 41-4-106 "confer[red] upon counties a broad authority to regulate airport activities, including the power 'to regulate the receipt, deposit, and removal and the embarkation of passengers or property to or from such airports; to exact and require charges, fees, and tolls . . . ; to lease or assign for operation such space or area . . . necessary or useful in connection therewith; . . . to provide rules and regulations governing the use of such airport and facilities and the use of other property and means of transportation within or over said airport.'" 937 F.2d at 1508. We concluded the City and County of Denver, in regulating shuttle bus services at the airport, had done precisely what was allowed by 41-4-106. Moreover, we concluded displacement of competition in the provision of shuttle bus services was a foreseeable result of the City and County of Denver's broad authority to regulate.

Here, citing the above-quoted statutes and relying heavily upon Allright, the district court held:

> Not only do state statutes specifically authorize cities and municipalities to take authority over airports, but they also allow for the issuance of bonds to finance and improve airports. The statute also gives the authority to establish a means to ensure repayment of those bonds. The City and County of Denver enacted the Denver Bond Ordinance pursuant to state authority, therefore the first part of the state action immunity test is met.
> Plaintiff argues that the Colorado Airport Act does not specifically refer to car rental activities. While this is true, the Court notes that the Colorado Airport Act does not specifically refer to shuttle bus services either. Nevertheless, the Tenth Circuit found that the Colorado Airport Act provided the necessary authority to displace competition. The case at hand involves "related activities" as referred to in Allright Colorado. The City and County of Denver clearly had the authority to issue bonds to finance new car rental facilities at DIA. Once the City and County of Denver issued

-14-

> bonds to finance the DIA facilities, it was within the best interest of the inhabitants of the State of Colorado and the City and County of Denver that those bonds be repaid. Therefore, under the authority of the Colorado Airport Act and the County and Municipality Development Revenue Bond Act, it is reasonably foreseeable that the City and County of Denver would enact anticompetitive legislation for the purpose of ensuring the principal and interest of the airport bonds be paid.

Appellant's append. at 31-32 (internal citations omitted). We agree. The above-cited statutes gave the City and County of Denver authority to construct car rental facilities at DIA, to issue bonds to cover the costs of construction, and to lease facilities to defendants. Further, although Ordinance 863 specifically refers only to the Bond Act, it is clear the City and County of Denver had authority, pursuant to C.R.S. § 41-4-106, to require defendants to impose the daily usage fee on their car rental customers. As we noted in Allright, 41-4-106 gives the City and County of Denver authority "to regulate the receipt, deposit, and removal and the embarkation of passengers . . . to or from" both Stapleton and DIA, "to exact and require charges, fees, and tolls," and "to provide rules and regulations governing the use of such airport and facilities . . . and means of transportation within or over said airport." As in Allright, this is precisely what the City and County of Denver did when it enacted the daily usage fee. Further, as in Allright, it is reasonably foreseeable that implementation of such authority could displace competition in the area of car rental services.

Because the Town of Hallie test has been satisfied, we conclude defendants are entitled to state action immunity from plaintiff's antitrust claims.

-15-

*Noerr-Pennington doctrine*

Defendants argue the Noerr-Pennington doctrine also provides them with immunity from plaintiff's antitrust claims. The Noerr-Pennington doctrine is based upon the protections of the First Amendment and exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition. United Mine Workers v. Pennington, 381 U.S. 657 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127 (1961); Oberndorf v. City and County of Denver, 900 F.2d 1434, 1439-40 (10th Cir.), cert. denied, 498 U.S. 845 (1990). "Immunity under the Noerr-Pennington doctrine is designed to protect the right to petition and engage in political activity." Oberndorf, 900 F.2d at 1440. In particular, the doctrine "protects rights of association and petition, which would be denied if groups with common interests could not, without violating the antitrust laws, use the channels and procedures of government agencies to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors." Id. (citing California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972)); see Professional Real Estate Investors v. Columbia Pictures Industries, 508 U.S. 49, 56 (1993) (doctrine encompasses private actions that "attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly").

Although the district court did not address this argument, we conclude the Noerr-Pennington doctrine exempts defendants from antitrust liability to the extent plaintiff is

challenging their efforts to convince the City and County of Denver to enact Ordinance 863 and impose the daily usage fee requirement.[1]

*Findings of fact contrary to allegations in plaintiff's complaints?*

Plaintiff contends the district court erred by making findings of fact which were contrary to the allegations in his two complaints, and without permitting any discovery or holding an evidentiary hearing. According to plaintiff, the court was obligated to take all facts pled in the complaints as true, as well as all inferences that could be reasonably drawn therefrom. Plaintiff also argues the court erred in concluding, based solely upon the provisions of Ordinance 863, that the City and County of Denver actively supervises the daily usage fee. More specifically, plaintiff argues that, in deciding whether the second prong of the Midcal test is satisfied, the court's inquiry "is incomplete if it does not include a close examination of what the municipality actually did in furtherance of its duty to actively supervise." Appellant's br. at 30 (underlining in original).

We conclude it was entirely appropriate for the district court to take judicial notice of the provisions of Ordinance 863. Federal Rule of Evidence 201 authorizes a federal court to take judicial notice of adjudicative facts at any stage of the proceedings, and in the absence of a request of a party. See Clemmons v. Bohannon, 918 F.2d 858, 865 n. 5 (1990), vacated on other grounds, 956 F.2d 1523 (1992); Melton v. City of Oklahoma

---

[1] Neither the original complaint nor the amended complaint specifically identified whether plaintiff was challenging defendants' successful efforts at lobbying the City and Count of Denver to pass Ordinance 863. However, because the amended complaint alleges defendants "sought, and ultimately obtained, a city ordinance purporting to 'compel' them to charge" the daily usage fee, appellant's append. at 6, we will assume for purposes of this appeal that plaintiff is challenging defendants' lobbying activities.

City, 879 F.2d 706, 724 (10th Cir. 1989), modified on other grounds, 928 F.2d 920 (10th Cir.) (en banc), cert. denied, 502 U.S. 906 (1991).  This includes taking notice of provisions in municipal ordinances.  Clemmons, 918 F.2d at 865 n. 5; see Melton, 879 F.2d at 724 (taking notice of Oklahoma City Charter).  Where, as here, a party requests a court to take judicial notice of adjudicative facts and supplies the court with the necessary information, Rule 201(d) requires the court to comply with the request.  Thus, the district court, having been presented with Ordinance 863 by defendants, was required to take judicial notice of its provisions.  To the extent that plaintiff's allegations conflicted with the provisions of the ordinance, plaintiff's allegations were appropriately rejected or ignored.  See Fed. R. Evid. 201.  Although plaintiff is entitled "to an opportunity to be heard as to the propriety of taking notice and the tenor of the matter noticed," Fed. R. Evid. 201(e), the instant appeal has certainly given him that opportunity.  Notably, there is nothing in his brief that effectively controverts or calls into question any of the provisions of Ordinance 863.

Because we have concluded the Town of Hallie test, rather than the Midcal test, is applicable here, we find it unnecessary to address plaintiff's argument that the provisions of Ordinance 863, considered alone, are insufficient to satisfy the active state supervision prong of the Midcal test.

The judgment of the district court is AFFIRMED.

96-1120, -1203, <u>Zimomra v. Alamo Rent-a-Car, Inc., et al.</u>,
J. Henry, concurring.

I concur in the majority decision, writing separately only to briefly note that though statute and precedent compel the above result, several scholars and judges, and perhaps even the ghost of Adam Smith, seem to warn that the policy behind our laws may need to be re-examined by appropriate local, state, and national legislative bodies.

Recent studies by Law and Economics scholars have questioned the wisdom of interfering with the marketplace under the state action exemption, set forth in <u>Parker v. Brown</u>, 317 U.S. 341, 350-52 (1943), from national antitrust law.  <u>See</u> <u>generally</u> William H. Page, <u>Interest Groups, Antitrust, & State Regulation:  Parker v. Brown in the Economic Theory of Legislation</u>, 1987 Duke L.J. 618, 625 (1987) (noting that "state economic regulation is frequently in sharp conflict with [economic efficiency], largely because of the problem of rent seeking by interest groups"); John Shepard Wiley, Jr., <u>A Capture Theory of Antitrust Federalism</u>, 99 Harv. L. Rev. 713, 723 (1986).  <u>But</u> <u>cf.</u> Merrick B. Garland, <u>Antitrust & State Action: Economic Efficiency &  the Political Process</u>, 96 Yale L. J. 486, 519 (1987) (critiquing approaches of Law and Economics scholars).  Though the state action exemption may be "grounded in principles of federalism," a bedrock principle of our political system, it is certainly also true that "[t]he preservation of the free market and of a system of free enterprise without price fixing or cartels is essential to economic freedom."  <u>F.T.C. v. Ticor Title Ins. Co.</u>, 504 U.S. 621, 632 (1992).

Where the principles of federalism and the free market collide, great caution is warranted in the balance we strike.  As Justice Kennedy observed for the majority in <u>Ticor</u>:

> Federalism serves to assign political responsibility, not to obscure it. Neither federalism nor political responsibility is well served by a rule that essential national policies are displaced by state regulations intended to achieve more limited ends. For States which do choose to displace the free market with regulation, our insistence on real compliance with both parts of the [California Retail Liquor Dealers Ass'n v. ]Midcal [Aluminum, 445 U.S. 97 (1980),] test will serve to make clear that the State is responsible for the price fixing it has sanctioned and undertaken to control.

Id at 636. Indeed, in Ticor, 36 states filed *amici curiae* briefs urging that broad application of the doctrine would not serve the states best interests. Id. at 635.

Certainly the market has been tinkered with before in order to provide such vital public services as airports. But one wonders why the car-renting consumer should have to pay for the facilities of those less efficient car rental companies who cannot compete with companies that can rent both facilities and automobiles competitively. Indeed, the small-desk car rental companies might as well have a desk as big as the companies that are trying harder since the hapless tourist is going to have to pay for it anyway. The litigation-spawning capabilities of state-sanctioned, anticompetitive bargains have been prophesied and questioned. See Frank E. Easterbrook, Foreword: The Court & the Economic System, 98 Harv. L. Rev. 4, 18 (1984) ("[A]nticompetitive bargains embedded in state legislation will become targets for challenge under the antitrust laws; the deference due toward a statute that corrects 'market failures' is not due toward a statute that creates them.").

As the majority opinion makes clear, the state action immunity doctrine once suggested two safeguards before allowing disruption of the market. First, a city or state must have clearly articulated and affirmatively expressed the state policy to supplant competition in this area. See City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410 (1978); Parker, 317 U.S. at 350-52. With respect to this requirement, where

private individuals or municipalities acted pursuant to state authorization, "[c]loser analysis [wa]s required." Hoover v. Ronwin, 466 U.S. 558, 568 (1984); Porter Testing Lab. v. Board of Regents, 993 F.2d 768, 770 (10th Cir. 1993). (Here, a not so close analysis reveals that the city's criterion seems to have included a clearly articulated agreement on the part of the rental companies to hold the city harmless in the event of a finding of anticompetitive activity. Aplt's Reply Br. at 1-2.) Second, the policy had to be "actively supervised" by the state itself. Midcal, 445 U.S. at 105.

This Midcal test remains the test for actions taken by states, but in Town of Hallie v. City of Eau Claire, 471 U.S. 34 (1985), the Court noted:

> In Midcal, we stated that the active state supervision requirement was necessary to prevent a State from circumventing the Sherman Act's proscriptions "by casting . . . a gauzy cloak of state involvement over what is essentially a private price fixing arrangement." 445 U.S., at 106 [sic]. Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interest, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

Id. at 46-47 (emphasis in original).

Given that Hallie does away with the active supervision prong for municipalities, we are left with an interference with competition based on the lobbying ability of those few who benefit from it. See John Cirace, An Economic Analysis of the "State-Municipal Action" Antitrust Cases, 61 Tex. L. Rev. 481, 488 (1982) ("The 'clearly articulated and affirmatively expressed' criterion involves the Court in the morass of

legislative intent and makes the applicability of federal antitrust turn on whether the statute's proponents had the 'skill [or] influence to generate proper legislative history.'") (quoting <u>Cantor v. Detroit Edison Co.</u>, 428 U.S. 579, 610 (1976) (Blackmun, J., concurring)); <u>see</u> <u>also</u> <u>Fisher v. City of Berkeley</u>, 475 U.S. 260, 269 (1986) ("There may be cases in which what appears to be a state- or municipality-administered price stabilization scheme is really a private price-fixing conspiracy, concealed under a 'gauzy cloak of state involvement.' This might occur even where prices are ostensibly under the absolute control of government officials.") (quoting <u>Midcal</u>, 445 U.S. at 106).

Professor Wiley suggests the state action doctrine be replaced with a doctrine that examines whether the market has been "captured" by a few players to the detriment of competition. 99 Harv. L. Rev. at 743. Though, like Justice Scalia, "I am skeptical about [] <u>Parker v. Brown</u>," <u>Ticor</u>, 504 U.S. at 640 (Scalia, J., concurring), I believe that rending the veil of the gauzy cloak may not require the adoption of Professor Wiley's intriguing model. Rather, we could insist that <u>Midcal</u>'s "clear articulation" be very clear, and that even in the case of municipalities, that there be active supervision (hopefully a bit more active than we have here), and that finally, we could require, *a la* <u>Hoover</u>, close analysis where private individuals are acting under state action immunity.

Noting our country's well-placed fealty to the free market, the persuasive criticism of noted scholars and judges, and even statements like that in <u>Ticor</u> that "state-action immunity is disfavored, much as are repeals by implication," 504 U.S. at 636, this doctrine has an amazing staying power. I am staying with it today because it is the law. As Judge Easterbrook observed, "Judges must be honest agents of the political branches. They carry out decisions they do not make." 98 Harv. L. Rev. at 60. The ultimate

resolution of this issue is properly left to either the Supreme Court, which could overrule Hallie and return to a test of greater scrutiny, or to the States and localities, which could reject these blandishments in honor of the invisible hand, or to Congress, which could fine- tune the Sherman Act. The obligation of this panel is to resolve the dispute before it, which the majority opinion correctly accomplished. But judges also have the opportunity if not the obligation to call attention to anomalous results. This seems to be one.